## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**BRANDON L. HOBBS,**

       **Petitioner,**

       **v.**

**WARDEN, ROSS CORRECTIONAL
INSTITUTION,**

       **Respondent.**

       **CASE NO. 2:16-CV-940
JUDGE JAMES L. GRAHAM
Magistrate Judge Kimberly A. Jolson**

## ORDER AND
## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, has filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is before the Court on the Petition (ECF No. 1), Respondent's Return of Writ (ECF Nos. 6, 9), Petitioner's Traverse (ECF No. 12), Respondent's Reply to Petitioner's Traverse (ECF No. 13), and the exhibits of the parties. For the reasons that follow, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED**.

Respondent's Motion to file additional citation (ECF No. 14) is **GRANTED**.

## I.    FACTS AND PROCEDURAL HISTORY

The Ohio Tenth District Court of Appeals summarized the facts and procedural history of this case as follows:

> On November 20, 2012, a Franklin County Grand Jury indicted appellant on counts of murder in violation of R.C. 2903.02, carrying a concealed weapon in violation of R.C. 2923.12, and having a weapon while under disability in violation of R.C. 2923.13. The charges arose out of the shooting death of Jaron Kirkling. Appellant entered a not guilty plea to the charges and proceeded to a jury trial.

> In September 2012, appellant sold his Chevy Suburban to Kirkling. Appellant told Kirkling that he could keep the license plates on the car until Kirkling could transfer the title to his name. Kirkling,

however, had some difficulty obtaining title in his name. In October 2012, appellant received a speeding ticket in the mail arising from Kirkling's driving of the Suburban. Appellant received it because the car was still in his name. Appellant contacted Kirkling to resolve the matter. Kirkling told him that he would pay for the ticket and that he would transfer the title to his name as soon as he could. Appellant was becoming annoyed that it was taking Kirkling so long to transfer the title and repeatedly talked to him on the phone about doing it.

On November 11, 2012, Kirkling and his cousin, Brandon Mackey, who had arranged the sale of the car, were sitting in the Suburban in Mackey's driveway. Appellant and his girlfriend, Shelby Abrams, drove up in their car and parked behind the Suburban. Appellant got out of the car, walked to the front of the Suburban, and took the front license plate off the car. When he walked to the back of the Suburban, Kirkling got out of the car and asked him what he was doing. Appellant told Kirkling that it had taken him too long to transfer the title so he was going to take the license plates. Kirkling did not want him to take the license plates and they began yelling at each other. Mackey tried to calm them down and asked his girlfriend, Melody Gaston, to come out of the house to tell the two men to leave the property. At this time, Abrams got out of appellant's car to take the license plate off the back of the Suburban. Kirkling walked around to that part of the car and pushed, moved, or somehow came into contact with Abrams to stop her from taking the plate. What happened next was the central dispute at trial.

Appellant testified that he was angry when he saw Kirkling push Abrams and started yelling at him. According to appellant, he and Kirkling continued to yell at one another until Kirkling pulled out a gun from his waistband and aimed it at him, which scared appellant. Within a second or two of seeing Kirkling's gun, appellant pulled out his own gun, stepped back and started shooting. Appellant shot four times at Kirkling who then fell to the ground. Kirkling did not fire his gun. Appellant fired two more shots and then took the gun from Kirkling's hands. He and Abrams then drove away.

Abrams supported appellant's version of events. She testified that Kirkling deliberately knocked her to the ground as she attempted to remove the license plate. Appellant came to her aide and yelled at Kirkling not to touch her. She then saw Kirkling pull out a gun. She ran to the safety of the car. She heard four initial shots and then four more shots a few seconds later. She did not see who fired

2

the shots. (Tr. 491–92.) Appellant and Abrams then drove away. In the car, Abrams saw that appellant had two guns.

Mackey and Gaston described the shooting differently. According to Mackey and Gaston, Kirkling did not pull out a gun when the incident occurred. Rather, appellant shot Kirkling because he was upset with him after he pushed Abrams. Nor did Gaston see appellant take a gun from Kirkling.

More than a year after the shooting, and only days after appellant's arrest, his former lawyer contacted the police and told them that he had two guns that had something to do with appellant's case. One was a Smith & Wesson M & P .40 caliber handgun and the other was a .357 caliber Glock Model 31 handgun. (Tr. 262.) Appellant admitted to shooting Kirkling with the .357 Glock during the confrontation. He also testified that he took the Smith & Wesson .40 caliber handgun from Kirkling that day. He had separately wrapped the two guns in plastic bags and delivered them to his lawyer. Police did not find any guns at the scene of the murder but found several .357 caliber bullet casings. There were no .40 caliber bullet casings.

DNA found on the barrel of the Smith & Wesson handgun was compared to DNA samples of appellant and Kirkling. That testing found a mixture of DNA from at least two individuals. Kirkling could not be excluded as the major contributor to that mixture of DNA. This DNA evidence arguably supported appellant's claim that Kirkling had a gun at the time of the shooting. In response, the state attempted to show other ways that Kirkling's DNA could have ended up on the handgun, such as an indirect transfer of the DNA from one person to another. The state also attempted to show that appellant often let other people handle guns that he had in his house although there was no evidence that Kirkling had ever been to appellant's house.

The jury rejected appellant's self-defense theory and found him guilty of murder and the attendant firearm specification as well as the two weapons charges. The trial court sentenced appellant accordingly.

II. The Appeal

Appellant appeals and assigns the following errors:

1. Trial counsel's acts and omissions deprived appellant of his right to effective assistance of counsel.

3

> 2. The trial court erred when it did not merge for purpose of sentencing the offenses of murder, carrying a concealed weapon, and having a weapon under a disability.

*State v. Hobbs*, No. 14AP-225, 2015 WL 3822239, at *1–3 (Ohio Ct. App. 2015).  On June 18, 2015, the appellate court affirmed the judgment of the trial court.  *Id.*  The Supreme Court of Ohio then declined to accept jurisdiction of the appeal.  *State v. Hobbs*, 143 Ohio St.3d 1481 (Ohio 2015).

On September 29, 2016, Petitioner filed the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  As his sole claim for relief, he asserts that he was denied his Sixth Amendment right to the effective assistance of trial counsel:

> Petitioner's counsel failed to object to the prosecutor's eliciting inadmissible and highly inflammatory testimony regarding Petitioner's history of drug dealing, and possession of, and transactions involving, multiple firearms; failed to object to the prosecutor's use of Petitioner's prior convictions for impermissible purposes; and failed to request curative and/or limiting instructions.  Counsel compounded the prejudice to his client by eliciting additional testimony regarding his client's drug trafficking and firearms activity.  Counsel's errors and omissions bore no reasonable relationship to legitimate trial strategy and constituted constitutionally deficient performance.  It is reasonably probable that, but for counsel's deficient performance, the jury would have acquitted Petitioner.

Respondent argues that this claim lacks merit.  (ECF Nos. 6, 13).

## II.    STANDARD OF REVIEW

Because Petitioner seeks habeas relief under 28 U.S.C. § 2254, the Antiterrorism and Effective Death Penalty Act ("AEDPA") governs this case.  The United States Supreme Court has described AEDPA as "a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court" and has emphasized that courts must not "lightly conclude that a State's criminal justice system has experienced the 'extreme malfunction' for

which federal habeas relief is the remedy." *Burt v. Titlow*,—U.S.—, 134 S. Ct. 10, 16 (2013) (quoting *Harrington v. Richter*, 562 U.S. 86 (2011)); *see also Renico v. Lett*, 559 U.S. 766, 773 (2010) ("AEDPA . . . imposes a highly deferential standard for evaluating state-court rulings, and demands that state court decisions be given the benefit of the doubt.") (internal quotation marks, citations, and footnote omitted).

AEDPA limits the federal courts' authority to issue writs of habeas corpus and forbids a federal court from granting habeas relief with respect to a "claim that was adjudicated on the merits in State court proceedings" unless the state-court decision either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Further, under AEDPA, the factual findings of the state court are presumed to be correct:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

Accordingly, "a writ of habeas corpus should be denied unless the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court, or based on an unreasonable determination of the facts in light of the evidence presented to the state courts." *Coley v. Bagley*, 706 F.3d 741, 748 (6th Cir. 2013)

(citing *Slagle v. Bagley*, 457 F.3d 501, 513 (6th Cir. 2006)).  The United States Court of Appeals

for the Sixth Circuit has succinctly explained these standards:

> A state court's decision is "contrary to" Supreme Court precedent
> if (1) "the state court arrives at a conclusion opposite to that
> reached by [the Supreme] Court on a question of law[,]" or (2) "the
> state court confronts facts that are materially indistinguishable
> from a relevant Supreme Court precedent and arrives" at a
> different result. *Williams v. Taylor*, 529 U.S. 362, 405, 120 S.Ct.
> 1495, 146 L.Ed.2d 389 (2000). A state court's decision is an
> "unreasonable application" under 28 U.S.C. § 2254(d)(1) if it
> "identifies the correct governing legal rule from [the Supreme]
> Court's cases but unreasonably applies it to the facts of the
> particular ... case" or either unreasonably extends or unreasonably
> refuses to extend a legal principle from Supreme Court precedent
> to a new context. *Id*. at 407, 529 U.S. 362, 120 S.Ct. 1495, 146
> L.Ed.2d 389.

*Coley*, 706 F.3d at 748–49.  The burden of satisfying AEDPA's standards rests with Petitioner.

*See Cullen v. Pinholster*, 563 U.S.170, 181 (2011).

## III.    DISCUSSION

Petitioner argues that his trial counsel rendered ineffective assistance of counsel, in

violation of the Sixth Amendment, by "failing to object to the prosecutor's eliciting inadmissible

and highly inflammatory testimony, regarding Petitioner's history of drug dealing, and

possession of, and transactions involving, multiple firearms; failing to object to the prosecutor's

use of Petitioner's prior convictions for impermissible purposes; and failing to request curative

and/or limiting instructions."   (ECF No. 1 at 5.)   He additionally asserts that counsel

"compounded the prejudice to [him] by eliciting additional testimony regarding his [] drug

trafficking and firearms activity."  (*Id.*)

The state appellate court considered Petitioner's ineffective assistance of counsel claim

(as presented) and rejected it:

In his first assignment of error, appellant argues that he received ineffective assistance of counsel. We disagree.

To establish a claim of ineffective assistance of counsel, appellant must show that counsel's performance was deficient and that counsel's deficient performance prejudiced him. *State v. Jackson*, 107 Ohio St.3d 53, 2005–Ohio–5981, ¶ 133, citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The failure to make either showing defeats a claim of ineffective assistance of counsel. *State v. Bradley*, 42 Ohio St.3d 136, 143 (1989), quoting *Strickland* at 697. ("[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.").

In order to show counsel's performance was deficient, the appellant must prove that counsel's performance fell below an objective standard of reasonable representation. *Jackson* at ¶ 133. The appellant must overcome the strong presumption that defense counsel's conduct falls within a wide range of reasonable professional assistance. *Strickland* at 689. To show prejudice, the appellant must establish that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *State v. Hale*, 119 Ohio St.3d 118, 2008–Ohio–3426, ¶ 204.

Appellant argues that his trial counsel was ineffective for eliciting certain "other acts" testimony that described his history of selling drugs and possessing guns and for failing to object to similar testimony presented by the state in violation of Evid.R. 404(B). He claims that the state presented this testimony to portray appellant as an armed drug dealer and that his trial counsel was ineffective for not preventing this and, in some instances, eliciting this inadmissible testimony by his own questioning.

Before any of this testimony, the trial court heard a motion in limine which addressed anticipated testimony regarding appellant's prior drug sales as well as his gun possession. (Tr. 230.) The trial court concluded that it would allow witnesses to testify about appellant having a gun and his drug sales if they occurred at the same time. The witnesses could not, however, simply provide gratuitous testimony regarding appellant's drug sales if a gun was not involved with those sales.

Appellant contends, however, that the state violated the trial court's ruling by simply portraying him as a drug dealer. First, in

Gaston's direct examination, the prosecutor asked about her previous interactions with appellant. Gaston testified that she had previously bought drugs from appellant at his house and that he had guns in his house that he let other people handle. Appellant's trial counsel objected to those questions but, the trial court overruled the objections. Appellant's trial counsel, in an attempt to impeach Gaston, then questioned her extensively about her drug usage and about the quantity of drugs she bought from appellant. At some point during that questioning, the trial court instructed appellant's trial counsel to stop questioning Gaston about her drug usage because it was not relevant to the case.

Appellant contends that this portrayal of him as a drug dealer continued in the prosecutor's cross-examination of Abrams. The prosecutor asked Abrams whether appellant sold drugs, whether he possessed guns, and whether he sold drugs to Gaston. Abrams testified that appellant was a drug dealer and had sold drugs to Gaston. She also testified that appellant had a Smith & Wesson handgun. (Tr. 505.) Trial counsel did not object to most of these questions.

Appellant then testified on his own behalf. He introduced himself to the jury by informing them that he had lived in Columbus all his life and that his employment included "sell[ing] drugs from time to time." (Tr. 553.) During the direct questioning of appellant, his trial counsel asked appellant about his history of selling drugs and his use and possession of guns. He also asked appellant how he got the gun that he used to shoot Kirkling. Appellant admitted that he bought the gun off the street. He also admitted that he went to Mackey's house to sell him drugs that day and that he had a gun because he was carrying a lot of money from drug sales.

During the state's cross-examination of appellant, the prosecutor questioned appellant about his history of selling drugs and then inquired about the link between selling drugs and carrying guns. Appellant described the different situations in which he would or would not have a gun. Those situations depended on whether he was carrying a large amount of drugs or money. The prosecutor also questioned appellant about how he came to be in possession of the gun (Glock Model 31) that he used to shoot Kirkling. Appellant testified that he bought the gun from a friend. He explained that he did not know whether that gun or the Smith & Wesson had been stolen. The prosecutor further questioned appellant about "all the different guns you've had at your house." (Tr. 636 .) Appellant described two or three guns that he owned. Trial counsel did not object to any of this questioning.

8

1.  Was this Trial Strategy?

Appellant argues that his trial counsel was ineffective for allowing and, in some instances, assisting the state in portraying him in a bad light through the "other acts" testimony concerning his drug dealing and history of gun possession in violation of Evid.R. 404(B). We disagree.

Evid.R. 404(B) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

The state does not argue that the admission of the above testimony was proper under Evid.R. 404(B). Instead, the state argues that trial counsel's strategy was to portray appellant as completely candid and truthful to the jury so that they would believe him when he testified that he shot Kirkling in self-defense. Therefore, the state argues, trial counsel made a strategic decision not to object to this testimony and, in fact, elicited some of this testimony in his own questioning, in an attempt to make appellant seem more candid and honest. We agree that this could be a legitimate trial strategy under the facts of this case.

Evidence of other crimes which come before the jury due to defense counsel's neglect, ignorance, or disregard of defendant's rights, and which bears no reasonable relationship to a legitimate trial strategy, will be sufficient to render the assistance of counsel ineffective. *State v. Hester*, 10th Dist. No. 02AP–401, 2002–Ohio–6966, ¶ 10; *State v. Rutledge*, 10th Dist. No. 92AP–1401 (June 1, 1993), citing *State v. Martin*, 37 Ohio App.3d 213, 214 (10th Dist.1987). Hindsight, however, is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel. *State v. Fritz*, 163 Ohio App .3d 276, 2005–Ohio–4736, ¶ 18 (2d Dist.), citing *Strickland; State v. H.H*, 10th Dist. No. 10AP–1126, 2011–Ohio–6660, ¶ 25, quoting *State v. Jackson*, 107 Ohio St.3d 300, 2006–Ohio–1, ¶ 138 ("Although introducing evidence of prior convictions or bad acts may be a questionable strategy in hindsight, this court generally 'refrains from second-guessing strategic decisions counsel makes at trial, even when counsel's trial strategy was questionable.'").

Here, appellant testified in support of his claim of self-defense. He testified that he was at Mackey's house to sell him drugs and that he had a gun because of the large amount of money he was carrying from other drug sales. Therefore, trial counsel would have understood that the jury was going to hear testimony about appellant's prior convictions, drug sales, and firearm use. Counsel's apparent trial strategy was to admit certain acts to lessen their significance to the jury and to bolster appellant's credibility so that the jury would believe his testimony that Kirkling threatened him with a gun and that appellant fired in self-defense. *Hester* at ¶ 13–14 (concluding that in light of evidence presented, calling defendant's parole officer in an attempt to bolster defendant's credibility was legitimate trial strategy). Credibility of witnesses is a critical factor in a case such as this where the state's witnesses and the defense witnesses tell two dramatically different versions of the shooting. Especially in such a case, it may be a legitimate trial strategy to admit to the jury bad things, thereby lessening the impact of those bad things on the jury and hopefully bolstering an accused's credibility by seeming completely honest. *State v. Ryan*, 6th Dist. No. WD–05–5120, 2006–Ohio–5120, ¶ 31–36 (questioning of defendant about prior convictions was a reasonable tactical decision and not ineffective); *State v. Delgado*, 8th Dist. No. 60587 (June 11, 1992) ("A knowledgeable trial counsel in an attempt to diminish the impact of an accused's character on the jury when introduced by the prosecution, can preempt the prosecution by first introducing such a character trait. It is a trial tactic that we cannot consider unreasonable as a matter of law.").

Trial counsel seemed to acknowledge this strategy in his closing argument, noting that "[t]his case is not a popularity contest. You're not being called upon to like [appellant]. Whether you do or whether you don't, quite honestly, is totally irrelevant with this case." (Tr. 750.) Trial counsel also highlighted appellant's honesty in an attempt to make him more credible to the jury.

> [Appellant] did not seek to hide from the truth. In fact, he wanted the truth to be told during this trial. If you listen to his testimony [and his girlfriend's], they were very straightforward with you. They didn't try to hide anything. They didn't try to minimize anything. They told you like it was.

> It didn't matter whether or not the fact[s] were good; it didn't matter whether or not the facts were

> bad; it didn't matter whether the facts were ugly. They told you. This young man got on the stand and said, "Yes, I sold drugs. Yes, I have convictions. Yes I possessed of a firearm and I shouldn't have had possession of a firearm.["] He didn't try to hide from that.

(Tr. 762–63.)

> We conclude that trial counsel's decision not to object and, in fact, to raise appellant's prior acts during direct examination is consistent with a legitimate trial strategy and, therefore, is not ineffective assistance of counsel. To the extent that trial counsel's cross-examination of Gaston addressed appellant's extensive history of drug sales, the scope of cross-examination clearly falls within trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel. *State v. Campbell*, 90 Ohio St.3d 320, 339 (2000); *State v. Otte*, 74 Ohio St.3d 555, 565 (1996). Trial counsel's questioning of Gaston about her history of buying drugs from appellant was an attempt to impeach her and was consistent with the strategy of freely admitting appellant's drug dealing history in an attempt to bolster his credibility. We will not second-guess that strategic decision. *State v. Carter*, 72 Ohio St.3d 545, 558 (1995) ("Judicial scrutiny of counsel's performance is to be highly deferential, and reviewing courts must refrain from second-guessing the strategic decisions of trial counsel").

> In light of trial counsel's legitimate trial strategy, we conclude that appellant has not demonstrated ineffective assistance of counsel. Accordingly, we overrule appellant's first assignment of error.

> FN1: Generally, when an accused testifies at trial, evidence of the accused's prior convictions is admissible to impeach under Evid.R. 609(A)(2) and (3). *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, ¶ 132.

*State v. Hobbs*, No. 14AP-225, 2015 WL 3822239, at *3–6 (Ohio Ct. App. 2015).

## A. *Strickland* and AEDPA

"In all criminal prosecutions," the Sixth Amendment affords "the accused . . . the right . . . to Assistance of Counsel for his defence." U.S. Const. amend. VI. "Only a right to 'effective assistance of counsel' serves the guarantee." *Couch v. Booker*, 632 F.3d 241, 245 (6th

Cir. 2011) (citation omitted). The United States Supreme Court set forth the legal principals governing claims of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 556 (1984). *Strickland* requires a petitioner claiming ineffective assistance of counsel to demonstrate that his counsel's performance was deficient and that he suffered prejudice as a result. 466 U.S. at 687; *Hale v. Davis*, 512 F. App'x 516, 520 (6th Cir. 2013). A petitioner "show[s] deficient performance by counsel by demonstrating 'that counsel's representation fell below and objective standard of reasonableness." *Poole v. MacLaren*, No. 12–1705, 2013 WL 6284355, at *5 (6th Cir. Dec. 5, 2013) (quoting *Davis v. Lafler*, 658 F.3d 525, 536 (6th Cir. 2011) (internal quotation marks omitted) and citing *Strickland*, 466 U.S. at 687). To make such a showing, a petitioner "must overcome the 'strong [ ] presum[ption]' that his counsel 'rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* (quoting *Strickland*, 466 U.S. at 687). "To avoid the warping effects of hindsight, [courts must] 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Bigelow v. Haviland*, 576 F.3d 284, 287 (6th Cir. 2009) (quoting *Strickland*, 466 U.S. at 689).

The United States Supreme Court has cautioned federal habeas courts to "guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d)." *Harrington v. Richter*, 562 U.S. 86, 105 (2011). The Court observed that while "'[s]urmounting *Strickland*'s high bar is never...easy.' . . . [e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is even more difficult." *Id.* (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010) and citing *Strickland*, 466 U.S. at 689). The Court instructed that the standards created under *Strickland* and § 2254(d) are both "'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Id.* (citations omitted).

Thus, when a federal habeas court reviews a state court's determination regarding an ineffective assistance of counsel claim, "[t]he question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id*.

### B.  Application

At its essence, Petitioner's argument is twofold.  First, he argues that his counsel's performance fell short by failing to limit and then affirmatively eliciting testimony regarding Petitioner's drug and gun history.  Second, Petitioner asserts that counsel should have requested a cautionary instruction regarding his uncharged criminal history.

### 1.  Testimony Regarding Drugs and Guns

The state appellate court concluded that defense counsel engaged in a legitimate strategy to present a truthful client.  Petitioner argues that such a conclusion was an unreasonable application of *Strickland*.  The Court disagrees for two primary reasons.  First, *White v. McAninch*, 235 F.3d 988 (6th Cir. 2000), the case on which Petitioner relies heavily, is distinguishable from this case.  Second, a review of the record supports the state appellate court's conclusion that counsel intended to present a truthful client, which is a legitimate trial strategy under *Strickland*.

### a.  White v. McAninch *is not a good fit here*.

Petitioner relies heavily on *White v. McAninch*, 235 F.3d 988 (6th Cir. 2000), to argue that counsel's unpreparedness caused his constitutionally deficient performance.  In *White*, the Sixth Circuit granted the petition for a writ of habeas corpus based, in part, on defense counsel's failure to object or request a limiting instruction on admission of evidence regarding an uncharged act of sexual intercourse in a prosecution for having oral sex with a child under the

13

age of thirteen. Petitioner argues that this case is like *White* in that defense counsel most likely developed the trial strategy attributed to him by the state appellate court during trial and as a result of his failure to prepare adequately. *See* Traverse (ECF No. 12, PageID# 1137–38.)

As discussed, AEDPA's deferential standard of review constrains this Court. In *White*, however, because the petitioner had "filed his habeas petition prior to April 24, 1996, the effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA") . . . pre-AEDPA law applie[d.]" Accordingly, the Court's question in *White* was different than what the Court must answer here, and the Court is mindful not to compare apples to oranges.

Moreover, the Sixth Circuit in *White* indicated that it based its decision on a record reflecting "woefully inadequate" trial preparation by defense counsel. *Id*. at 996. In coming to that conclusion, the Court noted, *inter alia*, that: counsel met with his client only two times prior to trial—once for a few minutes immediately following the arraignment and again on the morning of trial; counsel failed to seek or obtain formal discovery or a bill or particulars before trial; counsel failed to review two highly relevant videotaped statements prior to trial; counsel failed to seek a pelvic examination of the victim; and counsel never met with the assistant prosecutor responsible for trying the case. *Id.* at 990–91.

Once the *White* trial began, counsel's lack of preparation became clear. The indictment charged, "engaging in sexual conduct with [the victim] . . .[who] was less than thirteen years of age" between 1983 and 1987. *Id.* at 992. The victim had turned thirteen on August 15, 1987. Consequently, any incidents of sexual conduct which occurred after August 15, 1987, were beyond the scope of the indictment. In addition, the State had restricted its case against White to only acts of oral sex—any sexual incidents were beyond the scope of the State's case against White. *Id.* But the prosecutor went beyond those parameters when examining the victim, asking

14

her whether she had ever engaged in sexual conduct with the defendant beyond what was alleged in the indictment. *Id.*

Counsel did not object, and the victim testified that she and the defendant had sexual intercourse shortly before he was indicted in 1988—after her thirteenth birthday. *Id.* Then, on cross examination, defense counsel asked repeated questions about this uncharged conduct. During the federal habeas proceedings, defense counsel testified and claimed that his strategy had been to discredit the victim. *Id.* at 992–93. The Court disagreed, concluding that any such "strategy" resulted from counsel's gross lack of preparation. "[Counsel's] woefully inadequate trial preparation renders it highly implausible that he developed his theory that the victim was lying about the uncharged act, and thus, the numerous episodes of oral sex as well, prior to trial." *Id.* at 969.

The record here reads nothing like the record in *White*. In opening statement, defense counsel presented the defense that Petitioner had acted in self-defense. From the start, counsel set the stage for the jury: "Brandon Hobbs [] is confronted with a very precarious situation. He has his girlfriend who had just been assaulted. He sees Jaron pull out this firearm and he feels that he has no other option, no other alternative but to draw his as well." *Trial Transcript, Volume I* (ECF No. 9-1, PageID# 270.) "[T]his was simply a matter of who got off the first shot." (PageID# 271.) Throughout opening statement, counsel exhibited an understanding of the facts. For example, defense counsel attempted to explain the reason that four gun shots had entered through the victim's back. "The coroner. . . will not be able to tell you the position that the body was in when those shots were fired." (*Id.*) "In fact, he will tell you that the manner in which the projectiles enter the body are very consistent with someone turning to their side, in an

15

attempt perhaps maybe to avoid the shot or to get a better position to fire the shot on their own."
(PageID# 271–72.)

Defense counsel also offered an explanation for why Petitioner had removed Kirkling's gun and then surrendered the firearms to police—Petitioner thought that "Brandon Mackey, who came out of the residence firing a gun at him as he was leaving," would most certainly have removed Kirkling's gun and would not have turned it over to police. (PageID# 272–73.) As to the prosecution's star witnesses, Brandon Mackey and Melody Gaston, defense counsel told the jury that neither of them had been honest in their initial statements to police. (PageID# 273.)

Further, defense counsel had retained an expert to conduct an independent analysis of the firearms, indicating: "[T]he Ohio BCI did not make a determination or could not conclude from the evaluation of the [] firearm as to whether or not that firearm was . . . ever in the possession of Jaron Kirkland." (PageID# 274.)

> But. . . both firearms were [] submitted at the Defendant's request to our expert, Dr. Julie Heinig, with the DNA Diagnostic Center located in Fairfield, Ohio.
>
> They did an analysis. . . . [T]hey tested another area of the firearm in which they found the genetic material that was identified through DNA as belonging to Jaron Kirkland.

(PageID# 274–75.) Defense counsel told the jury that such physical evidence would support the testimony of Petitioner and his girlfriend, Shelby Abrams, indicating that Kirkland had pulled a gun on Petitioner. (*Id.*)

Defense counsel roughly followed this roadmap throughout the course of the trial. Accordingly, the Court rejects Petitioner's argument that counsel was ill-prepared or was making it up as he went along. *Cf. White v. McAninch*, 235 F.3d at 996.

*b.  Presenting a candid client is a legitimate trial strategy.*

In addition, much of Petitioner's argument focuses on how much the jury learned about his history with drugs and guns.  The admission of this evidence, however, was more nuanced than Petitioner presents.  Petitioner argues that his counsel should have kept such history from the jury.  Counsel did, however, attempt to limit the jury's exposure to this information. Specifically, it appears that counsel raised the issue with the trial court before Gaston, one of the prosecution's key witnesses, took the stand.  The court's "preliminary ruling" was that Gaston would be permitted to testify regarding Petitioner's possession of firearms, and also about his involvement in drugs so long as she had seen a firearm or firearms in his possession "in connection with the purchase or sale of drugs that she witnessed."  *Trial Transcript, Volume II* (ECF No. 9, PageID# 472–73.)  Specifically, the trial court indicated that, "if the sale of the drugs took place at the same time as this witness saw the gun, the State can go into both." (PageID# 473.)  The court also noted that "gratuitous[]" information about drug sales was inadmissible.  (*Id.*).  Thus, defense counsel attempted to keep this testimony out.

When Gaston testified, however, the court seemed to stray from its preliminary ruling. Counsel unsuccessfully objected:

> Q.      Why would you go to [Petitioner's] house?
> A.      We would to there to – just go over there or we would go over there to get some drugs.
>
> Mr. Benton:    Objection.
>
> By Ms. Chappelear:
> Q.      Okay.  So you --
>
> The Court:  Overruled.
>
> By Ms. Chappelear:
> Q.      Have you bought drugs from Brandon Hobbs?
> A.      Yes.

Q.      Did you see guns present when you would buy drugs from [Petitioner]?
A.      Yes.

Mr. Benton:  Same objection.

*The Court:  Note a continuing objection.*

*Trial Transcript, Volume II* (ECF No. 9, PageID# 623–74.) (emphasis added).

At this point, the cat was out of the bag.  Defense counsel had to choose a strategy consistent with the Court's ruling, and he did.  On cross examination, defense counsel attempted to discredit Gaston.  He elicited testimony regarding Gaston's and Mackey's drug use and firearm possession—forcing Gaston to acknowledge that she and Mackey bought marijuana, pills, and cocaine from the Petitioner.  *Transcript* (ECF No. 9-2, PageID# 630.)  Gaston also acted as a "middle person" purchasing drugs for others that they knew.  (PageID# 635.)  Mackey smoked weed.  (PageID# 638.)  Mackey ran into the house immediately after the incident, obtained his gun, and fired it.  (PageID# 675–78.)  Counsel thereby established that all of the testifying witnesses to the event in question had been involved in drugs and in drug dealing, and both Petitioner and Mackey (and purportedly Kirkling) had also possessed firearms.  Arguably, therefore, the jury had no reason to believe the testimony of Mackey and Gaston over that of the Petitioner and his girlfriend, Abrams, based merely on Petitioner's involvement with firearms and drugs.

The state appellate court concluded that "counsel's questioning of Gaston about her history of buying drugs from appellant was an attempt to impeach her and was consistent with the strategy of freely admitting appellant's drug dealing history in an attempt to bolster his credibility."  *Hobbs*, 2015 WL 3822239, at *14.  That is not an unreasonable application of *Strickland*.

18

Petitioner also challenges counsel's decision to elicit testimony from him regarding his criminal history. However, defense counsel had legitimate reasons for asking these questions. For example, Petitioner needed to explain his possession and use of a stolen firearm because law enforcement officers had testified that both firearms had been stolen out of two separate burglaries which occurred on the same day in November 2011 from two separate residences. *Transcript Vol. II* (ECF No. 9-2, PageID# 507.) Also, Petitioner intended to testify on his own behalf in order to convince the jury that he had acted in self-defense. Defense counsel accordingly knew that the jury most likely would learn that Petitioner had a prior conviction. Rule 609(A)(2) of the Ohio Rules of Evidence provides that "evidence that the accused has been convicted of a crime is admissible if the crime was punishable by death or imprisonment in excess of one year pursuant to the law under which the accused was convicted and if the court determines that the probative value of the evidence outweighs the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Although Petitioner complains that trial counsel did not require the trial court to conduct a weighing inquiry of the prejudicial value of admission of Petitioner's prior conviction on improperly handling of a firearm with its probative value under Ohio Rule of Evidence 609(A)(2), as noted by the state appellate court, generally a prosecutor can cross-examine a criminal defendant who testifies at trial on prior convictions, including "'the name of the crime, the time and place of conviction, and sometimes the punishment.'" *State v. Bryan*, 101 Ohio St.3d 272, 291 (Ohio 2004) (citation omitted). Petitioner does not indicate, and it is not apparent from the record, the basis on which evidence of Petitioner's prior adult conviction would have been inadmissible under Ohio law.

Petitioner additionally argues that his prior felonious assault delinquency adjudication would have been precluded under Ohio Rule of Evidence 609(D). Rule 609(D) states that

"[e]vidence of juvenile adjudications is not admissible except as provided by statute enacted by the General Assembly." The relevant statute, O.R.C. § 2151.357(H), provides:

> Evidence of a judgment rendered and the disposition of a child under the judgment is not admissible to impeach the credibility of the child in any action or proceeding. Otherwise, the disposition of a child under the judgment rendered or any evidence given in court is admissible as evidence for or against the child in any action or proceeding in any court in accordance with the Rules of Evidence[.]

Thus, evidence of a defendant's prior juvenile adjudication is not absolutely prohibited under Ohio law. "[I]n order to have such evidence admitted, a defendant must make a 'plausible showing' that he intends to use the evidence for a proper purpose, which does not include an attempt merely to impeach the witness' credibility." *State v. Murray*, No. CA2008-10-125, 2009 WL 1743723, at *1 (Ohio Ct. App. 2009) (citing *State v. Pirman*, 94 Ohio App.3d 203, 210 (Ohio Ct. App. 1994) (quoting *State v. Lukens* (1990), 66 Ohio App.3d 794, 803 (1990)). *See State v. Goodwin*, No. 99CA220, 2001 WL 1740065, at *5 (Ohio Ct. App. 2001) (holding that testifying defendant "opened the door" to admission of his juvenile adjudication used to demonstrate that "he had more knowledge than he claimed about the law, his rights and firearms").

> In reviewing the case law interpreting the rule and statute excluding juvenile adjudications for impeachment purposes, it appears that there is a distinction between general impeachment and specific impeachment. *See State v. Hilty* (Oct. 19, 1990), Trumbull App. No. 89T4204, unreported, 3. Where the submission of the juvenile adjudication is done merely to disclose that the adjudication exists in order to denigrate the former offender's general credibility, the juvenile adjudication is inadmissible. However, where submission of the juvenile adjudication is done for the purposes of specifically impeaching the credibility of the former offender, the adjudication appears to be admissible. *Id.* at 4 (distinguishing between a general attack on credibility as contemplated in R.C. 2151.358(H) and specific use of a prior conviction to explicitly contradict one's testimony). For instance, a prior juvenile adjudication may be admitted to specifically impeach a witness's credibility by establishing bias. Moreover,

> where the witness testifies about an aspect of his life in a favorable
> manner, the opponent may use juvenile adjudications to
> specifically contradict that testimony.

*Id*. at *4; *see also State v. Krueger*, 176 Ohio App.3d 95, 105 (Ohio Ct. App. 2008) (holding that juvenile adjudication based on misuse of grandmother's credit card admissible in subsequent prosecution for stealing money from the grandmother "both as another act or wrong to show [] intent to commit the charged offenses. . . and to contradict appellant's direct testimony."). In short, defense counsel may have been able to keep out the juvenile adjudication but maybe not.

As to all of these issues, the state court concluded that "[c]ounsel's apparent trial strategy was to admit certain acts to lessen their significance to the jury and to bolster appellant's credibility so that the jury would believe his testimony that Kirkling threatened him with a gun and that appellant fired in self-defense." *Hobbs*, 2015 WL 3822239, at *12–13. At base, the state appellate court concluded that counsel engaged in a legitimate trial strategy to present a candid client. Considering the record as a whole, that decision was not an unreasonable application of *Strickland* and its progeny.

### 2. Jury Instructions

Petitioner's argument regarding jury instructions warrants separate attention. Although neither party addressed the issue, Petitioner may have waived this claim. "As a necessary component of the exhaustion of state remedies doctrine, a petitioner's claim must be 'fairly presented' to the state courts before seeking relief in the federal courts." *Whiting v. Burt*, 395 F.3d 602, 612 (6th Cir. 2005) (citing *Baldwin v. Reese*, 541 U.S. 27 (2004)); *Picard v. Connor*, 404 U.S. 270, 275 (1971). In order to satisfy the exhaustion requirement in habeas corpus, a petitioner must fairly present the substance of his constitutional claim to the state courts. *Anderson v. Harless*, 459 U.S. 4, 6 (1982); *Picard*, 404 U.S. at 275. Although the fair

presentment requirement is a rule of comity, not jurisdiction, *see Castille v. Peoples*, 489 U.S. 346, 349 (1989); *O'Sullivan v. Boerckel,* 526 U.S. 838, 844–45 (1999), it is rooted in principles of comity and federalism designed to allow state courts the opportunity to correct the State's alleged violation of a federal constitutional right that threatens to invalidate a state criminal judgment.

A petitioner fairly presents the "substance of his federal habeas corpus claim" when the state courts are afforded sufficient notice and a fair opportunity to apply controlling legal principles to the facts bearing upon the constitutional claim. *Harless,* 459 U.S. at 6.  On the other hand, a petitioner does not fairly present a claim if he presents an issue to the state courts under one legal theory and set of facts, and then presents the issue to the federal courts under a different legal theory or a different set of facts.  Rather, a petitioner must present to the federal court essentially the same facts and legal theories that were considered and rejected by the state courts.  *See, e.g.*, *Lott v. Coyle*, 261 F.3d 594, 607 (6th Cir. 2001) (finding that relatedness of claim of involuntary jury waiver to claim of failure of trial court to follow statutory requirements for effectuating valid jury waiver was not enough to preserve the former for habeas review).

The requirement of exhaustion must be waived expressly, and this Court may *sua sponte* raise the issue.  *Tolliver v. Sheets*, 530 F.Supp.2d 957, 962 (S.D. Ohio 2008) (citing *Benoit v. Bock,* 237 F. Supp. 2d 804, 807 (E.D. Mich. 2003) (citing 28 U.S.C. § 2254(b)(3); *Rockwell v. Yukins*, 217 F.3d 421, 423–24 (6th Cir. 2000); *Prather v. Rees*, 822 F.2d 1418, 1422 (6th Cir. 1987)).  Likewise, a federal court may in its discretion *sua sponte* raise the issue of procedural default, particularly by providing the petitioner with an opportunity to respond.  *Id.* (citations omitted); *see also Wade v. Sheets*, No. 2:09-cv-632, 2012 WL 870221, at *15 (citing *Howard v. Bouchard*, 405 F.3d 459, 476 (6th Cir. 2005), *r'hng and r'hng en banc denied July 6, 2005*

(citing *Lorraine v. Coyle*, 291 F.3d 416, 426 (6th Cir. 2002)); *Elzy v. United States*, 205 F.3d 882, 886 (6th Cir. 2000)). However, "the Sixth Circuit strongly discourages the *sua sponte* invocation of procedural affirmative defenses that were not raised by the respondent." *Benoit*, 237 F. Supp. 2d at 807 (citing *Scott v. Collins*, 286 F.3d 923, 928–29 (6th Cir. 2002) (discussing the waiver of the affirmative defense of procedural default based on the State's failure to raise the issue)).

In this case, Petitioner's state appellate brief argued that his counsel's deficient performance called into question the jury's verdict on aggravated murder. *See Principal Brief of Appellant Brandon L. Hobbs* (ECF No. 6-1, PageID# 120-121.) In the context of that argument, Petitioner briefly mentioned counsel's failure to request a cautionary instruction concerning the other acts testimony. *See id.* Petitioner did not raise counsel's failure to request such an instruction as an independent basis for review or a separate assignment of error. It is thus questionable as to whether Petitioner exhausted this claim. *See, e.g.*, *Wagner v. Smith*, 581 F.3d 410, 415-16 (6th Cir. 2009) (holding that petitioner did not fairly present claim by use of vague headings in the state appellate brief that failed to clarify factual basis of claim); *Lenoir v. Warden, S. Ohio Corr. Facility*, 886 F. Supp. 2d 718, 728 (S.D. Ohio 2012) (holding that petitioner did not fairly present claim of prosecutorial misconduct based upon different facts than his claim as he presented it to the state appellate court). Moreover, Petitioner has failed to establish cause for such failure. And, now, because he is out of time to exhaust, this claim arguably is procedurally defaulted.

However, as noted, Respondent has not argued procedural default. Under these circumstances, the Court finds the fairest and most efficient way to resolve this claim is on the merits, which AEDPA permits. 28 U.S.C. § 2254(b)(2) ("An application for writ of habeas

corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the court of the State."); *Jackson v. Houk*, No. 3:07-cv-400, 2008 U.S. Dist. LEXIS 36061, at *76 (N.D. Ohio May 1, 2008) ("Although the Court finds all or some portion of nine of Petitioner's claims for relief are procedurally defaulted and should be dismissed, the Court has determined to reach the merits of these defaulted claims in an effort to promote judicial efficiency and preserve judicial resources.").

There is, however, one additional wrinkle.  The state appellate court never expressly addressed this claim (most likely because it was not fairly presented).  Indeed, the state appellate court made no mention of the jury instructions in its decision.  It thus seems that AEDPA's deferential standard of review does not apply because "AEDPA's express terms limit its application to claims that have been adjudicated on the merits by a state court."  *Barton v. Warden, S. Ohio Corr. Facility*, 786 F.3d 450, 459 (6th Cir. 2015) (citing *Williams v. Anderson*, 460 F.3d 789, 796 (6th Cir. 2006)).  Where a federal claim has been presented to a state court and the state court denies relief, "it may be presumed that the state court adjudicated the claim on its merits in the absence of any indication or state-law procedural principles to the contrary."  *Harrington v. Richter*, 562 U.S. 86, 99 (2011) (citation omitted).  Likewise, where a state court makes clear that it is deciding a claim both on the merits and on procedural grounds, the Court applies AEDPA deference to that adjudication.  *Id*. at 461 (citing *Brooks v. Bagley*, 513 F.3d 618, 624 (6th Cir. 2008)).  Here, because Petitioner did not fairly present his claim of ineffective assistance of counsel based on his attorney's failure to request a jury instruction, the Court cannot conclude that the state appellate court's decision, which does not refer to the issue, adjudicated such a claim on the merits.  This wrinkle, however, is without consequence because

under any standard of review—*Strickland* or *Strickland* plus AEDPA, Petitioner's claim fails on the merits.

> Here, Petitioner argues that counsel should have requested the following instruction:

> 1. CROSS-EXAMINATION. Each witness is subject to direct examination by the party who calls him and to cross-examination by the opposite party. During cross-examination, counsel may inquire into matters that do not directly relate to the issues. Such questions and answers are permitted for the purpose of helping you to determine his credibility and the weight to be given to his testimony and for no other purpose.
> 2. CREDIBILITY: OTHER ACTS. The court points out that (on direct examination the witness denied that ...) (... on cross-examination the witness volunteered that ...). This statement was not directly related to any issue in this case and the same is true of the answer to the present question; however, the answer is permitted solely for the purpose of helping you to test the credibility or weight to be given his testimony as a witness and for no other purpose.

(ECF No. 12, PageID #1138, n.12.)

> The Court rejects this argument for several reasons.  First, the Court notes that the Court *did* instruct the jury regarding Petitioner's criminal convictions as follows:

> Testimony was introduced tending to show that the defendant had been adjudicated as a delinquent of felonious assault and convicted of improper handling of a firearm in a motor vehicle. You may only consider this testimony to judge the defendant's credibility and the weight to be given to his testimony.

*Trial Transcript, Volume IV* (ECF No. 9-3, PageID #1161).  Thus, the instruction Petitioner urges would have been only for uncharged criminal conduct, which of course was only a portion of the testimony the jury heard regarding guns and drugs.

> Second, during closing argument, both sides told the jury not to convict Petitioner because of his history with guns and drugs.  For example, defense counsel noted, "[w]hether or not [Petitioner] was engaged in any other criminal conduct is immaterial, unless that criminal conduct contributed to his creating the affray and making his the aggressor, and it did not."  *Trial Transcript, Volume IV* (ECF No. 9-3, PageID #1024.)  The prosecution agreed, telling the jury:

> Do not convict this man of murder because he's a dope dealer. Okay? That's not a reason to convict him of murder. Do not convict this man because he was in possession of stolen guns. Do not convict this man because he was in possession of the gun when he wasn't supposed to, okay?

*Trial Transcript, Volume IV* (ECF No. 9-3, PageID #1033.)

Third, "experienced trial attorneys know that [cautionary] instructions can operate like directions to a person to stand in the corner and not think about polar bears: not only does it raise the importance of the polar bear idea in the person's mind, but there is no way to find out if they thought about bears or not." *Vore v. Warden*, No. 1:13-cv-800, 2014 WL 7227972, at *4 (S.D. Ohio Dec. 17, 2014). Counsel easily could have made the strategic decision not to draw additional attention to the uncharged conduct.

For all of these reasons, the Court concludes that counsel's failure to request the cautionary instruction does not constitute deficient performance under *Strickland*. Indeed, this Court must "'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Bigelow v. Haviland*, 576 F.3d 284, 287 (6th Cir. 2009) (quoting *Strickland*, 466 U.S. at 689). Further, even if counsel's performance was deficient, failure to request the cautionary instruction was not prejudicial. This is especially true because the prosecution did not rely on the uncharged conduct to push for a conviction. To the contrary, the prosecution told the jury not to convict on that basis. *Trial Transcript, Volume IV* (ECF No. 9-3, PageID #1033.) Under such circumstances and considering the record as a whole, there is not a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

## IV.  RECOMMENDED DISPOSITION

For the foregoing reasons, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED.** Respondent's Motion to file additional citation (ECF No. 14) is **GRANTED.**

**Procedure on Objections**

If any party objects to this Report and Recommendation, that party may, within fourteen days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. 636(B)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation *de novo,* and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

Date:  July 21, 2017                                           /s/ Kimberly A. Jolson
                                                                          KIMBERLY A. JOLSON
                                                                          UNITED STATES MAGISTRATE JUDGE